**ATTACHMENT B**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Kate Funk, being duly sworn, depose and state the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2010. I have been assigned to the Complex Financial Crimes Squad with primary investigative responsibilities involving criminal matters particularly related to economic or white-collar crime since 2012. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money laundering, investment fraud, and corporate fraud.  My education includes a Bachelor's of Science in Accounting from the University of Kansas.

2. The FBI is investigating Wahid Benabbas ("Benabbas") and co-conspirator, referred to hereinafter as "RM", and others known and unknown for, among other things, conspiracy to commit wire fraud, in violation of 18 U.S.C. §371.

3. This affidavit is submitted in support of an application for a criminal complaint and arrest warrant for Wahid Benabbas.  Based on evidence in this investigation as summarized below, I submit there is probable cause to believe that Benabbas and RM did knowingly combine, conspire, confederate and agree among themselves and with each other to commit Wire Fraud (18 U.S.C.§ 1343) an offense against the United States, to wit: having devised a scheme to defraud and obtain the monies of another by means of materially false and fraudulent pretenses, representations and promises and for the purposes of executing the scheme did cause writings, signs, and signals to be transmitted in interstate and foreign commerce, in violation of Title 18, United States Code, Section 371.

4. The facts set forth in this affidavit are based upon my personal observations and review of records, my training and experience, written reports, information obtained by other FBI case agents, FBI financial investigators, and investigators at Kaiser Permanente ("KP") into this criminal matter. This affidavit is intended to show that there is probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.

**BACKGROUND INFORMATION**

5. According to their website, KP is a not-for-profit health plan that was founded in 1945 in Oakland, California, serving 12.2 million members.  According to information provided in KP's referral of this matter to the FBI, KP's Colorado Region is comprised of approximately 54 medical and administrative buildings whose infrastructure is maintained by approximately 32 building engineers and supervisors.  This consists of three teams, or hubs, of building engineers each led by a hub supervisor.

6. KP's Colorado region had been renovating and updating the Building Automation Systems ("BAS") that serve to monitor and control the Heating, Ventilation, Air Conditioning ("HVAC"), lighting, security, and similar systems of each KP building. The BAS is a "smart" system of electronic components that can be accessed remotely via network by authorized engineers and maintenance technicians to monitor and control building systems. An essential component of a BAS is the Java Application Control Engine ("JACE") controller, which is used to communicate with other electronic and mechanical components within the building.

7. According to documents provided by KP as well as interviews conducted by KP, RM had been employed with KP since approximately November 1988. He held the position of Chief Engineer starting in approximately January 2006. As the Chief Engineer and as an assigned Project Engineer, RM evaluated proposals from vendors, selected the appropriate vendor for the job, submitted the purchase order to the KP purchasing department for processing, and often approved invoices for payment. In June 2018, RM was promoted to Construction Staff Project Manager for KP's National Facility Services ("NFS"). In addition to his duties as Construction Staff Project Manager, RM reassumed the responsibilities of Chief Engineer from August 2018 through October 2018.

8. According to documents provided by KP as well as interviews conducted by KP, Benabbas had been employed by KP as a Senior Consultant of Maintenance Services for KP's NFS-Facility Operations Security and Energy since approximately November 2007. Benabbas' duties included supervising the BAS for KP in the Colorado Region. He was also assisting KP with upgrading the current BAS system in Colorado as well as other regions outside of Colorado.

9. RM and Benabbas were both exempt salaried employees of KP and were not eligible for overtime pay.

10. In July 2018, KP received a tip on KP's National Compliance Fraud Hotline from an anonymous caller who alleged RM had improper vendor relationships and was receiving kickbacks from the vendors he approved to work at KP facilities. The caller also alleged RM was operating his own private business and felt this was a conflict of interest. The caller stated KP building engineer Benabbas may be doing consulting work for RM. KP conducted an internal investigation of the allegations reported.

<u>Entities Involved in the Scheme</u>

11. Records obtained from the Colorado Secretary of State show that Epsilon Controls, LLC ("Epsilon Controls") was formed by RM and Benabbas on October 23, 2013. Corporate documents listed Benabbas as the person forming the LLC and RM as an additional organizer.

12. KMG is a small, Colorado-based company with six employees. KMG had been an approved vendor for KP since 2003. "MG" was KMG's President. KMG maintained multiple electrical service work and HVAC related contracts with KP throughout the years. A signed contract between KMG and KP, valid from 1/28/2016 through 1/27/2019, stated that KMG's scope of services were related to electrical work.

<u>KP Policies</u>

13. KP has a documented Vendor Relationships policy that prohibits the following vendor relationships: (1) employees may not be a supplier/vendor to KP while employed by KP, (2) employees may not also be employed by suppliers/vendors to conduct work for KP or at a KP facility, and (3) employees may not also be contractors to suppliers/vendors for contracts or assignments where the customer or the client is KP.  In addition, KP required certain employees to annually review and sign a Conflict of Interest Questionnaire.  Vendors were also required to comply with the signed Service Agreements, which included the Vendor Code of Conduct.

14. KMG's Service Agreement with KP included a section labeled "Accepted Subcontractors and Schedule of Values".  The section included the following language: "For each Services Order[1], Contractor shall attach a list of selected subcontractors and the accepted cost of their work for their respective portions of the Services. The costs listed thereon shall also constitute an accepted schedule of values.  Contractor shall not enter into a subcontract with any subcontractor other than those listed on the each Services order, except with prior written approval of Kaiser."

15. KP also required contractors to comply with additional guidelines, to include the KP Vendor Code of Conduct which contains the minimum standards by which each supplier is expected to conduct itself when providing services to KP. Under the KP Vendor Code of Conduct, dated October 2011, December 2015 and September 2016, which is required and referenced in the Service Agreements with KMG , it states the conflict of interest between a vendor and KP personnel, or the appearance thereof, should be avoided. It further states that when an actual, potential, or perceived conflict of interest occurs, that conflict must be disclosed, in writing, by the vendor to a person of authority at KP other than the person who has the relationship with the vendor. KP Personnel are not permitted to work for a vendor if KP is the client. MG was aware that RM and Benabbas worked for KP and that there was a conflict of interest, yet he did not disclose this to KP as required[2].

16. RM and Benabbas both completed KP Conflicts of Interest Questionnaires annually for years 2014 through 2017. Questions in the questionnaire include the following: a) Have you held a paid position for a competitor or Vendor of KP as a management employee, a consultant or independent contractor; b) If you have control or influence over transactions with KP customers or suppliers, have you or any family member held financial interest with those companies or their competitors during the last 12 months; c) Are you aware of any actual or potential conflicts of interest other than those disclosed in this questionnaire.  RM and Benabbas responded with "No" for all questions and did not disclose their ownership or affiliation with Epsilon Controls, or any other potential conflicts of interest, in any of the Questionnaires they submitted from 2014 through 2017.

---

[1] Within the contract, KP states each work assignment is deemed a "Request for Service" or "Services Order".

[2] In the Vendor Service Agreement for KMG, RM and Benabbas were the first KP employees listed in the KP Colorado engineer contact list.

17. KMG had "blanket purchase orders" which allowed them to do work for KP on an "as needed" basis for projects throughout the region. Their invoices were submitted to Accounts Payable in Colorado and then routed to the Engineer Supervisor also in Colorado. If the invoice amount exceeded $2500, the invoice was passed up to RM for approval. By authorizing the payment of the invoice, the approver validated that the work was completed.

## INVESTIGATION OF RM AND BENABBAS BY KP

18. After receiving the tip noted in paragraph 10, KP began an internal investigation into RM and Benabbas. As part of their investigation, they interviewed several KP employees to include RM and Benabbas. KP shared numerous documents related to their investigation with the FBI to include, but not limited to, memorandums of employee interviews.

19. On October 2, 2018, KP Investigators interviewed RM. RM stated that he formed and owned Epsilon Controls jointly with Benabbas. RM stated that Epsilon Controls used KP vendor KMG as a pass-through vendor to obtain funds from KP. RM stated he knew this was wrong and in violation of KP policies.

20. RM further stated that the purchase of 100 JACE controllers in December 2016 was one of the projects invoiced by KMG but directed and managed by Epsilon Controls. RM stated the 100 JACE controllers were purchased with end of year capital funds and were to be used to upgrade facilities in the Colorado Region. He could not recall if they solicited other bids for the project as required by KP policy. RM stated that the $6,000 price for each JACE controller represented a significant cost saving for KP because Benabbas would be doing the installation work[3]. Bids from other vendors for this work would have included a charge for the installation. In addition, RM stated this arrangement allowed him to make money. RM stated he verified that all 100 JACE controllers were delivered when he approved the payment of the KMG invoice, but he was unable to confirm all 100 JACE controllers were installed. He explained that KMG did not have anything to do with the project other than to prepare the proposal and submit the invoice. RM estimated that KMG kept approximately $10,000 of the $621,000 that was billed to KP. RM admitted that only 70 or 80 of those JACE controllers were installed as of October 2, the date of his interview.

21. RM stated that transactions involving KMG in which Epsilon Controls was involved were transactions where KMG acted as a pass-through vendor to Epsilon Controls. RM stated that KMG issued an invoice to KP for payment and KP paid KMG. After receiving payment from KP, KMG would keep some of the funds as payment for their help in the transaction before issuing a check to Epsilon Controls.

22. RM was not able to provide any names of other Epsilon Controls customers.

---

[3] Although the invoice associated with the 100 JACE controllers did not break out a labor charge, KP was billed for labor associated with JACE controllers on other invoices in this scheme.

23. On October 3, 2018, Wahid Benabbas was interviewed by KP Investigators. Benabbas confirmed he and RM owned Epsilon Controls.  RM filed the paperwork required to start the business.  Benabbas thought owning the business might be a "compliance issue" with KP.

24. Benabbas and RM worked with authorized KP vendor KMG to bill KP for work completed by Epsilon Controls so that it would look like KMG had completed the work. Benabbas stated that Epsilon Controls was able to acquire the JACE controllers at a significantly lower price than the authorized vendors working on the BAS.  KMG would keep 10 percent or less of the invoiced amount, depending on what RM had negotiated with them.

25. Benabbas stated the usual method for obtaining BAS system solutions for KP was to request three or four bids from different vendors before selecting a vendor for the job. RM handled the paperwork for the projects, which entailed soliciting and approving the bid proposals submitted by KP's authorized vendors.  RM and Benabbas were able to ensure their bid was lower than other vendors because they knew what the other vendors were submitting as a bid to do the work.  After the KMG proposal was approved, Benabbas, through Epsilon Controls, was to provide and install the JACE controllers called for in the job proposal. KMG then sent a billing invoice to the KP Colorado Region accounts payable department. Once paid, KMG wrote a check to Epsilon Controls for the amount of the bid proposal less their negotiated fee.  KMG provided limited assistance, such as cabling or running wires, in the installation of the controllers.

26. Benabbas wrote the proposal for submission to KP management for the 100 JACE controllers.  Benabbas stated that there never was a delivery of 100 JACE controllers as described in the proposal and invoice. Benabbas purchased the controllers over a period of time.  Benabbas purchased approximately 20 JACE controllers from a legitimate United States supplier, Wilson-Mohr.  He purchased another 60 JACE controllers in Canada and France at flea markets and through off-market deals.  He obtained some of these controllers for free, but he said the average price he paid was about $3,000 to $4,000[4]. Benabbas stated that he bought the controllers outside of the normal supply chain, modified controllers to circumvent licensing requirements, and programmed and installed the JACE controllers. Benabbas described this as a "win-win" situation because KP received parts and service at a reduced cost and Epsilon Controls could make "tons of money." Benabbas said he replaced about 56 or 57 JACE controllers in KP buildings and said there were 46 or 47 controllers in his personal vehicle.  He provided these remaining controllers to KP after the October 3, 2018 interview.

27. Benabbas was not able to provide names of any other Epsilon Controls customers.

28. On October 2, 2018, MG, President of KMG, was interviewed by KP Investigators. MG said that he met RM in 1999 and described their relationship as strictly business.

---

[4] According to Invoice #12-091880, KP was charged $6,000 per JACE controller. Benabbas said that vendors charged $15,000 to $18,000 for these same controllers.

MG stated there were multiple HVAC-related contracts in the past few years in which RM instructed MG to utilize the subcontractor Epsilon Controls. MG had not done business with Epsilon Controls outside of a KP contract. It was MG's understanding that Epsilon Controls did not have a contractual relationship with KP. RM was MG's point of contact on all the projects where KMG utilized Epsilon Controls as a subcontractor. RM provided MG with Epsilon Control's fees for the specific contract, usually by email. MG included Epsilon Control's fees in his KP proposal and subsequent invoice. MG submitted his proposals and invoices directly to RM in the form of a Word document. He recalled that on at least one occasion, RM reworded his invoice and sent it back to him. RM told MG that Epsilon Controls would procure certain parts needed for the contract. Once KP paid KMG's invoice, MG met with RM in person to pay Epsilon Controls by check. At the same time, RM provided him with an Epsilon Controls invoice. MG denied knowing that Epsilon Controls was controlled by RM and Benabbas.

29. During the KP investigation, KP found and collected relevant records from the KP computers used by RM and Benabbas, including Epsilon Controls bank statements, tax documents, emails, and copies of checks. As a result of KP's investigative findings, on October 12, 2018, RM and Benabbas were terminated by KP. KP had also suspended future projects and work orders with KMG.

## BANK ACCOUNTS UTILIZED IN THE SCHEME

### U.S. Bank Account 103681420248 (0248) in the name of Epsilon Controls, LLC

30. On January 31, 2014, U.S. Bank account ending in 0248 was opened in the name of Epsilon Controls, LLC. The signors on the account were Benabbas and RM. This account was solely used as an operating account for Epsilon Controls.

### J.P. Morgan Chase (Chase) Bank Account 635604315 (4315) in the name of KMG Electric Inc. (KMG)

31. On February 27, 2008, Chase account ending in 4315 was opened in the name of KMG. The signors on the account are Linda L. MG and Mark MG. This is a vendor business checking account.

### U.S. Bank Account 203681000915 (0915) in the name of Wahid Benabbas

32. On October 2, 2001, U.S. Bank account ending in 0915 was opened in the name of Wahid Benabbas, the sole signor on the account. This account received funds from Epsilon Controls operating account ending in 0248.

### U.S. Bank Account 103671824078 (4078) in the name of Wahid Benabbas

33. On May 10, 2001, U.S. Bank account ending in 4078 was opened in the name of Wahid Benabbas, the sole signor on the account. This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Account 103673466043 (6043) in the name of Wahid Benabbas and Fatima Azmi**

34. On January 14, 2003, U.S. Bank account ending in 6043 was opened in the name of Wahid Benabbas and Fatima Azmi, both signors of the account. This account received funds from Epsilon Controls operating account ending in 0248.

## SUMMARY OF FINANCIAL RECORDS

35. Case agents and FBI Financial Investigators have reviewed the KMG invoices and financial records and learned the following:

   a. From October 26, 2015 to July 25, 2018, KMG submitted nine invoices to KP for $1,420,598. Chase bank account in the name of KMG ending in 4315, along with records provided by KP, show that KP paid the invoices in full for a total amount of $1,420,598 to KMG.

   b. Chase bank account in the name of KMG ending in 4315 and U.S. Bank account in the name of Epsilon Controls ending in 0248 show that KMG paid Epsilon Controls approximately $1,058,246 by check[5]. The bank records do not show payments from KMG to Epsilon Controls after August 23, 2018. KMG likely did not pay Epsilon Controls for Invoices 12-092204 and 12-092205 totaling $298,000.

## KP's REVIEW OF BAS SYSTEMS

36. In October 2018, KP initiated a review of their BAS systems to determine if any of the work invoiced by KMG was completed by Epsilon Controls. KP concluded their review in approximately November 2019. The results of their review are as follows[6]:

   a. KP was billed for and paid approximately $727,400[7] for approximately 124 JACE controllers through KMG. After reviewing their network, they found approximately 41 to 45 of these JACE controllers were actually installed at KP.

   b. KP was billed for and paid approximately $544,003[8] for other parts. Due to the vague descriptions in the invoices, KP was unable to determine which parts were received on several of the invoices. KP found that in two invoices, no parts were received and in two invoices only a portion of parts were

---

[5] All checks were endorsed by RM.

[6] The numbers below do not included $21,900 charged for sales tax.

[7] There were at least four invoices that did not itemize the cost charged for the JACE controller and therefore were not included in this amount.

[8] This amount may include cost charged for JACE controllers when parts charged were not itemized.

received.

c. KP was billed for and paid approximately $127,295 in labor.  If any of this work was completed, it was likely completed by Benabbas, who is a salaried employee of KP and not eligible for overtime pay.

## OVERT ACTS

37. In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one coconspirator in the State and District of Colorado and elsewhere, which overt acts include the following:

a. On or about March 5, 2018, KMG submitted a proposal for $73,250 for the parts and labor related to add 5 new JACE controllers to the KP Waterpark II building located in Aurora, Colorado.

b. On or about March 5, 2018, KMG submitted another proposal to KP for $58,500 for the parts and labor related to add 5 new JACE controllers to the Kaiser Permanente Waterpark III building located in Aurora, Colorado.

c. On or about April 7, 2018, Epsilon Controls invoiced KMG $67,890 for that Waterpark II building project.

d. On or about April 7, 2018, Epsilon Controls invoiced KMG $55,860 for the Waterpark III building project.

e. On or about May 11, 2018, KMG invoiced KP $73,250 for the KP Waterpark II building.  This is the same amount that was listed in the proposal on March 5, 2018.

f. On or about May 11, 2018, KMG invoiced KP $58,500 for the KP Waterpark III building. This is the same amount that was listed in the proposal on March 5, 2018.  According to a Senior Investigator at KP, all invoices are processed and approved for payment in California.

g. According to a Senior Investigator at KP, all invoices are processed and approved for payment in California. In addition, the KMG invoices were submitted by email to a KP Accounts Payable email account maintained and accessed in California or were submitted to a KP employee based in Colorado.  The KP employee in Colorado could then enter the invoice detail into KP's Accounts Payable system, One Link, for review and approval by employees in California.  Thus, the submission of the KMG invoices by the transmission from Colorado to California with both invoice submission options were events which occurred in interstate commerce.

h. On or about June 11, 2018, KP sent a $131,750  ACH transfer to J.P. Morgan Chase Bank Account ending in 4315 in the name of KMG for the two May 11, 2018 invoices.  The Chase account had a Colorado address.

i. According to a Senior Investigator at KP, all ACH transfers for KP invoice

payments are initiated in California through a Citibank bank account.  The above ACH transfer was initiated in California and terminated in Colorado, thus affecting interstate commerce.

j.  On or about June 26, 2018, KMG wrote a check to Epsilon Controls for $123,750 with memo "Waterpark II & III".  It was deposited on June 26, 2018 into the U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC.

k.  On or about July 9, 2018, $5,000 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 6043 in the name of Wahid Benabbas and Fatima Azmi.

l.  On or about July 9, 2018, $5,000 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 4078 in the name of Wahid Benabbas.

m.  On or about July 23, 2018, $5,000 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 4078 in the name of Wahid Benabbas.

n.  On or about July 23, 2018, $369.09 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 6043 in the name of Wahid Benabbas and Fatima Azmi.

o.  On or about August 6, 2018, $5,000 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 6043 in the name of Wahid Benabbas and Fatima Azmi.

p.  On or about August 8, 2018, $5,000 was transferred via mobile banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 4078 in the name of Wahid Benabbas.

q.  On or about August 20, 2018, $10,000 was transferred via Internet banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 0915 in the name of Wahid Benabbas.

r.  On or about August 23, 2018, $9,000 was transferred via Internet banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon Controls, LLC to U.S. Bank Account ending in 0915 in the name of Wahid Benabbas.

s.  On or about August 23, 2018, $1,000 was transferred via Internet banking transfer from U.S. Bank Account ending in 0248 in the name of Epsilon

Controls, LLC to U.S. Bank Account ending in 0915 in the name of Wahid Benabbas.

## CONCLUSION

38. Based on the investigation described above, probable cause exists to believe that Benabbas and co-conspirator RM (uncharged herein) did knowingly combine, conspire, confederate and agree among themselves and with each other to commit Wire Fraud (18 U.S.C. § 1343) an offense against the United States, to wit: having devised a scheme to defraud and obtain the monies of another by means of materially false and fraudulent pretenses, representations and promises and for the purposes of executing the scheme did cause writings, signs, and signals to be transmitted in interstate and foreign commerce, in violation of Title 18, United States Code, Section 371.

*/s/ Kate Funk*

Kate Funk
FBI Special Agent

I, Special Agent Kate Funk, being duly sworn, hereby depose and state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

Submitted, attested to, and acknowledged by reliable electronic means on January 8, 2020.

United States Magistrate Judge
United States District Court
District of Colorado

**Affidavit reviewed and submitted by Robert Brown, Assistant United States Attorney.**